Marina Mezitis DIORINOU,
Petitioner–Appellee,

v.

Nicholas H.E. MEZITIS, Respondent–Appellant.

Docket No. 00–9501.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 5, 2000.
Decided: Jan. 9, 2001.

Stuart F. Gartner, Gartner, Bloom & Greiper, P.C., New York, NY, on the brief for respondent-appellant.

Robert D. Arenstein, New York, NY, on the brief for petitioner-appellee.

Before NEWMAN, KEARSE, and WINTER, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal, concerning the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), involves a request by a mother for an order requiring a father to return their two children to Greece, the country from which he removed them

earlier this year. The principal issue is the deference that a United States court considering a Hague petition should accord to a judgment of another country adjudicating a prior Hague petition, in this instance, a petition unsuccessfully brought by the father in an attempt to challenge the mother's retention of the children in Greece in 1995.

Respondent–Appellant Dr. Nicholas H.E. Mezitis appeals from an amended order of the United States District Court for the Southern District of New York (Louis L. Stanton, District Judge), entered Nov. 30, 2000, directing him to return the children to Greece. *See Diorinou v. Mezitis*, No. 00 CIV. 8241(LLS), 2000 WL 1793177 (S.D.N.Y. Nov.28, 2000). The order was entered upon a petition filed by Petitioner Appellee Marina Mezitis Diorinou, the children's mother, pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C.A. §§ 11601–10 (West 1995 & Supp.2000). Although the case is complicated by the issuance of conflicting custody awards made by the courts of Greece and New York, we conclude that the District Court correctly deferred to the Hague Convention ruling made by the courts of Greece in favor of Diorinou on the critical issue of whether she had wrongfully retained the children in Greece, and we therefore affirm.

## Background

Mezitis, a citizen of the United States, and Diorinou, a citizen of Greece, were married in 1988.[1] They have two children, Elias, born in New York on October 27, 1993, and Alexandra, born in New York on December 7, 1994. Both children, now seven and six, are dual citizens of the United States and Greece. The family lived in New York, except for summer vacations in Greece, at least until the beginning of the summer of 1995. At that

---

1. The District Court opinion recites that the marriage occurred in New York. A decision of the Court of First Instance of Thessaloniki, considering Mezitis's application to give rec-

ognition to a New York custody judgment, states that the marriage occurred in Thessaloniki.

time, the parties and their children flew to Greece for another summer vacation.

During the summer of 1995 (if not before), the marriage began to fall apart. The parties dispute some of the events of that summer, especially the circumstances, considered *infra*, under which Mezitis and Diorinou separately returned to New York at the beginning of September 1995, with the children remaining in Greece at the home of Diorinou's parents in Thessaloniki. In New York, relations between Mezitis and Diorinou deteriorated to the point where, on September 9, 1995, she obtained from the New York Family Court (Sara P. Schechter, Judge) a temporary protective order prohibiting her husband from harassing her. Diorinou soon returned to Greece. The children, then ages twenty-three months and nine months, lived in Greece with their mother from the fall of 1995 until October 1, 2000. On that date Mezitis took possession of the children in Greece pursuant to his visitation rights under a Greek judgment awarding custody to Diorinou, and, without the knowledge or consent of Diorinou, brought the children back to New York, conduct that has given rise to the pending ICARA lawsuit.

*Prior litigation.* Resolution of this appeal regrettably requires understanding of the complicated pattern of litigation that preceded the pending ICARA lawsuit. On September 11, 1995, Mezitis filed in the New York Supreme Court an action for divorce and custody of the children and an action for a writ of habeas corpus to obtain return of the children. On September 14, 1995, Diorinou filed in the Court of First Instance of Athens an application for temporary custody of the children. On Sep-tember 27, 1995, Mezitis filed an ICARA suit in the Southern District of New York, seeking an order under the Hague Convention requiring Diorinou to return the children from Greece. On December 2, 1995, the Court of First Instance of Athens provisionally awarded custody of the children to Diorinou. On January 12, 1996, the District Court in New York (Loretta A. Preska, District Judge) dismissed Mezitis's ICARA suit without prejudice for lack of jurisdiction because the children were not then within the Southern District. *See* 42 U.S.C. § 11603(b) (ICARA court "authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed"). Judge Preska expressed the view that the children (then ages two years, two months, and one year, one month) "have been habitually resident [in New York] throughout their lives."

On February 9, 1996, Mezitis submitted a Hague Convention petition to United States authorities for transmittal to Greek authorities.[2] On April 8, 1996, the Government of Greece, acting on behalf of Mezitis, filed a petition under the Hague Convention ("Greek Hague petition") to compel Diorinou to return the children to Mezitis in New York.[3] On July 29, 1996, the Court of First Instance of Thessaloniki denied the petition in a decision we consider *infra*. On July 30, 1996, the Court of First Instance of Athens postponed decision on Diorinou's application for permanent custody of the children pending a final judgment on the Greek Hague petition.

Back in New York, on February 6, 1997, the New York Supreme Court (Fern Fisher–Brandveen, Justice) scheduled a hear-

---

**2.** The Hague Convention obliges each Contracting State to designate a Central Authority "to discharge the duties which are imposed by the Convention upon such authorities," including the duty of Central Authorities "to cooperate with each other ... to secure the prompt return of children...." Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, arts. 6, 7, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (herein-after "Hague Convention"). The State Department is the Central Authority for the United States. *See* Exec. Order No. 12,648, 53 Fed.Reg. 30,637 (Aug. 11, 1988), *reprinted in* 42 U.S.C. § 11606 (1994).

**3.** The petition was filed by the Greek Ministry of Justice, the Central Authority for Greece.

ing on Mezitis's habeas corpus application for February 27, 1997, and expressed the view that "the children were domiciliaries of New York State all their lives until shortly before the events that lead up to this *habeas corpus* proceeding." On February 27, 1997, Justice Fisher–Brandveen, acting in the habeas proceeding, issued a warrant for Diorinou's arrest and a precept for the return of the children.

Back in Greece, on May 28, 1997, the July 29, 1996, judgment dismissing the Greek Hague petition was affirmed by the Court of Appeals of Thessaloniki, a decision we consider *infra.*

Back in New York, on July 24, 1997, the New York Supreme Court (Sherry Klein Heitler, Justice) awarded temporary custody of the children to Mezitis, and on November 17, 1997, signed a judgment of divorce and awarded permanent custody of the children to Mezitis.[4] Justice Heitler noted that Diorinou had been notified of the divorce and custody proceeding via mailings to her and her lawyer in Greece, and that neither Diorinou nor anyone on her behalf had appeared in court, at least since the case had been assigned to Justice Heitler. In her ruling on permanent custody, Justice Heitler stated that "there came a time in the Summer of 1995 at which the defendant, Marina Mezitis [now Diorinou], took the children to Greece and remained there, refusing to return the children to the United States of America." Justice Heitler also noted that counsel "has advised this Court on several occasions that there were proceedings in

Greece, that there had been no final decisions with regard to any of those proceedings." Judge Stanton would later note that Mezitis did not inform Justice Heitler that his Greek Hague petition had been denied and the denial affirmed.[5]

Back in Greece, on January 30, 1998, the Court of First Instance of Athens, which had stayed Diorinou's custody application pending decision of the Greek Hague petition, awarded custody of the children to Diorinou. That court considered and rejected Mezitis's contention that the Greek custody proceeding should be stayed pending the outcome of the New York custody proceeding. On July 2, 1998, the Greek Supreme Court rejected the appeal by the Greek government on behalf of Mezitis, challenging the decision of the Court of Appeals of Thessaloniki adverse to Mezitis on the Greek Hague petition. On February 26, 1999, the Court of First Instance of Thessaloniki rendered judgment in favor of Mezitis on his petition for recognition of the divorce and custody judgments of the New York Supreme Court.[6] On May 6, 1999, the Court of Appeals of Athens affirmed the January 30, 1998, judgment awarding custody of the children to Diorinou. In rejecting Mezitis's appeal, the appellate court acknowledged that Greek law normally affords preclusive effect to final judgments of a foreign court, and noted his claim that the custody award of the New York Supreme Court in his favor had become final. Nevertheless, the appellate court ruled that Mezitis was not

---

4. During this sequence of events, on October 29, 1997, Mezitis obtained from a Greek court an order according him visitation rights for the children on condition that visitation occur in Greece.

5. Justice Heitler noted that "there is an ICARA proceeding which is pending," referring explicitly to the ICARA litigation in the Southern District that had been dismissed without prejudice by Judge Preska on January 12, 1996.

6. The Court rendering this judgment reckoned with the Greek Hague petition litigation,

which by then had concluded in favor of Diorinou, but ruled that under Article 19 of the Hague Convention, a judgment regarding a child's return (in this instance, non-return) has no bearing on a custody decision. However, the Court also ruled that the outcome of the Greek Hague petition in favor of Diorinou precluded giving recognition to the New York Supreme Court judgment in the habeas corpus action, because that judgment called for return of the children to New York, contrary to the Greek Hague convention judgment declining to require their return.

entitled to rely on the New York judgment as a basis to appeal Diorinou's Greek custody award because Mezitis had not "present[ed] any certificate of the [New York court] nor other documents *proving* that [the New York custody] judgment is final and produces precedent" (emphasis added).[7] It appears that the appellate court did not doubt that the New York custody judgment had been entered, but deemed lacking adequate evidence that the time to appeal had expired.

On July 16, 1999, the Court of Appeals of Thessaloniki reversed the February 26, 1999, judgment of the Court of First Instance of Thessaloniki that had accorded recognition to the New York custody judgment. This appellate court ruled that "recognition" of a foreign precedent "is not possible, if there is already precedent from [a] Greek judgment," regardless of whether the Greek judgment was rendered before or after the foreign judgment.[8] "Recognition" was denied to the New York Supreme Court custody judgment because of the subsequent judgment of the First Instance Court of Athens awarding custody of the children to Diorinou.

*The pending litigation.* In response to Mezitis's action in taking the children from Greece to New York on October 1, 2000, Diorinou filed the pending ICARA lawsuit on October 27, 2000. By order signed on November 27 and entered on November 29 (later amended on November 30), Judge Stanton ordered Mezitis forthwith to return the children to their residence in Thessaloniki. The District Court helpfully stayed its order until November 30 to permit Mezitis to seek a stay pending appeal from this Court. A judge of this Court extended that stay until December 5, at which time this panel expedited the appeal, scheduled oral argument (after prompt briefing) for December 8, and extended the stay until disposition of the appeal. We also directed that, pending appeal, Mezitis transfer care and temporary custody of the children to Diorinou in New York, and required her to surrender to the District Court her passport and those of the children. We also invited the views of the United State Department of State on the pending appeal, and have received, with extraordinary promptness, a helpful reply, supporting affirmance of the District Court's order. *See* Letter from Daniel S. Alter, Asst. U.S. Atty. to Roseann B. MacKechnie, Clerk (Jan. 5, 2001).

### Discussion

■ *Standard of review and the different meanings of "comity."* The standard of review we are to apply to the District Court's rulings depends on the nature of those rulings. Judge Stanton's core ruling was that he would "adopt," as a matter of full faith and credit, comity, and *res judicata,* the determination of the highest court of Greece in the Greek Hague petition litigation that Diorinou did not wrongfully retain the children in Greece. Our review of rulings as to full faith and credit and *res judicata* (and collateral estoppel) is *de novo.* *See Conopco, Inc. v. Roll Int'l,* 231 F.3d 82, 86 (2d Cir.2000) (full faith and credit); *SEC v. Monarch Funding Corp.,*

---

**7.** The appellate court also ruled that it need not await a final judgment in the then-pending proceeding in the Court of First Instance of Thessaloniki on Mezitis's petition for recognition of the New York custody judgment because the custody appeal would not be affected by a ruling in the recognition proceeding. The appellate court appears to be saying (the translation is somewhat unclear) that whatever benefits flow from a judgment in a proceeding to recognize a foreign judgment do not include according the foreign judgment preclusive effect in an action, or appeal of an action, adjudicating the same matter (here custody) pending before a Greek court; in such an action or appeal, the party relying on the preclusive effect of the foreign judgment must provide sufficient evidence to establish the finality of the foreign judgment.

**8.** The opinion implied that, under Greek law, an earlier foreign judgment is entitled to preclusive effect in a similar action on the merits between the same parties, but is not entitled to "recognition" in the event that a Greek court enters a differing judgment subsequent to the foreign judgment.

192 F.3d 295, 303 (2d Cir.1999) (collateral estoppel). Our review of decisions involving international comity depends on the sense in which that term is being used.

■ United States courts have said that they are deferring to foreign proceedings or adjudications as a matter of "comity" in at least three different contexts.[9] In one context, the domestic court considers whether to proceed with litigation properly within its jurisdiction because of the pendency or availability of litigation in a foreign forum. *See, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246–50 (2d Cir.1999); *Jota v. Texaco, Inc.*, 157 F.3d 153, 159–61 (2d Cir.1998). When domestic courts in that context say that they are deferring to foreign tribunals as a matter of "comity," *see Finanz*, 192 F.3d at 246; *Jota* 157 F.3d at 159, 160, they are invoking a doctrine akin to *forum non conveniens*. A dismissal on grounds of *forum non conveniens* is reviewed for abuse of discretion, *see Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir.2000), and the same standard of review has been explicitly held to govern a similar abstention in favor of foreign proceedings on grounds of international comity, *see Finanz*, 192 F.3d at 246; *Jota*, 157 F.3d at 160; *Pravin*, 109 F.3d at 856.

■ In a second context, a domestic court considers whether to enforce a foreign judgment. *See, e.g., Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *Victrix Steamship Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709 (2d Cir. 1987). Here too domestic courts say that the issue of whether to defer to the foreign tribunal's adjudication of the underlying matter is a matter of "comity." *See Hil-*

ton, 159 U.S. at 163, 16 S.Ct. 139; *Victrix*, 825 F.2d at 713, 714. In that context, domestic courts have not clearly articulated the standard of appellate review of the decision whether to enforce the foreign judgment, but appear to be applying a *de novo* standard, *see Hilton*, 159 U.S. at 203–29, 16 S.Ct. 139 (reversing judgment to enforce French judgment because of fraud in procuring it); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141–142 (2d Cir.2000) (affirming district court's decision not to enforce a Liberian judgment because of unfairness of foreign court system); *Victrix*, 825 F.2d at 713–16 (affirming district court's decision not to enforce British judgment because of pending Swedish bankruptcy proceedings), just as they would on review of a judgment in an action to enforce a judgment of a court within the United States, *see Bank of Mississippi v. Knight*, 208 F.3d 514, 516 (5th Cir.2000).

■ In a third context, illustrated by the pending case, a domestic court considers whether to accept the adjudication of a foreign tribunal on a cause of action or a particular issue, *see, e.g., Overseas Inns S.A. v. United States*, 911 F.2d 1146, 1148–50 (5th Cir.1990) (foreign determination that Internal Revenue Service was unsecured creditor denied preclusive effect); *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F.Supp. 658, 663–66 (S.D.N.Y. 1996), *aff'd mem.*, 122 F.3d 1055 (2d Cir. 1997); *Gordon and Breach Science Publishers S.A. v. American Institute of Physics*, 905 F.Supp. 169, 179 (S.D.N.Y.1995), often stating, as Judge Stanton did here, *see Diorinou*, 2000 WL 1793177, at \*5, that they are doing so as a matter of "comity," *see Gordon and Breach Science Publishers*, 905 F.Supp. at 178–79 ("It is well-

---

**9.** Domestic courts have also used the term "comity" in two other contexts not directly related to foreign proceedings or adjudications. In *Pravin Banker Associates v. Banco Popular Del Peru*, 109 F.3d 850, 855–56 (2d Cir.1997), we agreed with the District Court's decision that comity considerations did not justify a further delay of domestic litigation to afford time for "the completion of Peru's negotiations with its creditors," *id.* at 856. In

*Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036, 1046–50 (2d Cir.1996), we assessed comity considerations "as a canon of construction" that "might shorten the reach of a statute," *id.* at 1047, but ultimately ruled that the Bankruptcy Code should not be construed to bar pre-petition transfers susceptible to challenge in British courts, *see id.* at 1051–53.

established that United States courts are not *obliged* to recognize judgments rendered by a foreign state, but may *choose* to give res judicata effect to foreign judgments on the basis of comity.") (emphases in original). In that context, as in the enforcement of foreign judgments context, appellate courts have not explicitly articulated the standard of review, but we believe the standard is *de novo* review, *see Overseas Inns*, 911 F.2d at 1149 n. 4 ("[W]hether to grant comity [to a foreign tribunal's adjudication of an issue] appears to be a mixed question of law and fact . . . ."), just as it would be on review of a judgment of a domestic court based on *res judicata* or collateral estoppel, *see Monarch Funding Corp.*, 192 F.3d at 303 (collateral estoppel decisions reviewed *de novo*). In making that *de novo* review, a further issue arises as to the nature of the deference the trial court (and the appellate court in its *de novo* review) should accord to the foreign adjudication. *See Bata v. Bata*, 163 A.2d 493, 505 (Del.1960) ("[T]he rule of collateral estoppel, often difficult of application to domestic judgments . . . , presents additional difficulties when sought to be applied to foreign judgments."). We consider that matter *infra.*

■ *Hague Convention litigation and the parties' contentions.* We recently considered the Hague Convention and its domestic implementing statute, ICARA, in *Blondin v. Dubois*, 189 F.3d 240 (2d Cir. 1999). As we there noted, in an ICARA suit " 'a United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.' " *Id.* at 245 (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.1993)); *see* Hague Convention, Art. 19; ICARA, 42 U.S.C. § 11601(b)(4). "The abduction claim is limited, initially, to a determination of whether the defendant has 'wrongfully removed or retained' the child; on this issue the plaintiff bears the burden of proof." *Blondin*, 189 F.3d at 245 (quoting 42 U.S.C. § 11603(e)(1)(A)).

In the pending case, Diorinou contends that, in October 2000, Mezitis wrongfully removed the children from Greece, which she contends is their "habitual residen[ce]" within the meaning of Article 3 of the Convention. On the other hand, Mezitis contends that, in September 1995 and thereafter, Diorinou wrongfully retained the children in Greece, that their habitual residence at that time was (and, since then, is) New York, and that her prior wrongful retention precludes a finding that his subsequent removal of the children was wrongful. These conflicting contentions require an understanding of the relevant provisions of the Convention, analysis of these provisions and of ICARA as applied to this case, and consideration of the deference an ICARA court owes to the relevant adjudications of other courts.

*Hague Convention provisions.* Under Article 3 of the Convention a "removal" or a "retention" is "wrongful" if

(a) it is in breach of rights of custody attributed to a person . . . , either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Article 12 requires the return of a child wrongfully retained or removed:

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

*See also* ICARA, 42 U.S.C. § 11603(e)(1).

Article 13 provides defenses to an order for return:

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . which opposes its return establishes that—

(a) the person . . . having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

(b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

*See also* ICARA, 42 U.S.C. § 11603(e)(2)(A), (B).

*Application of Convention provisions.* The Convention contemplates that a person exercising custody rights over a child will use the remedies of the Convention (and its domestic implementing statutes) to redress the wrongful removal or retention of the child. Thus, in this case, when Mezitis believed that Diorinou had wrongfully retained the children in Greece in September 1995, he caused a Hague petition to be filed on his behalf in Greece. If we were now considering a second Hague petition to effect return of the children from Greece after Diorinou's retention of them in September 1995, we would have to consider the deference one Hague petition court should accord to a Hague petition decision of another court adjudicating the same alleged treaty violation. However, our litigation concerns Diorinou's Hague petition to return the children to Greece, in which she challenges what she alleges was the wrongful removal of the children by Mezitis from Greece to New York in October 2000. That matter, as will appear, ultimately concerns the deference to be accorded the decisions arising from the Greek Hague petition, particularly the adjudication of Diorinou's 1995 retention of the children, but the analysis does not start with that issue.

Judge Stanton correctly began his analysis of the parties' competing contentions by focusing first on the issue of the children's habitual residence in October 2000, just prior to the removal by Mezitis that Diorinou is challenging in this proceeding. *See Diorinou,* 2000 WL 1793177, at *3. At that time, she had, and was "exercis[ing]" within the meaning of Article 3(b), custody rights granted her on January 30, 1998, by the Court of First Instance of Athens, in a decision affirmed on May 6, 1999, by the Court of Appeals of Athens. Although a further appeal is pending before the Supreme Court of Greece, Mezitis has not claimed, or attempted to establish, that the Greek custody award has been stayed. Thus, Mezitis's removal was in breach of her custody rights in Greece, and the removal was wrongful under Article 3(a) if Greece was then the children's habitual residence.

Mezitis contends, without dispute, that the children's habitual residence from their birth until the summer of 1995 was New York. He further contends that Diorinou wrongfully retained the children in Greece in September 1995 and that her wrongful retention cannot create habitual residence for them in Greece. In his view, their habitual residence continues to be New York. If that were so, his removal of the children in October 2000 would not be wrongful under Article 3(a) because Diorinou would not then be exercising custody rights under the laws of New York. The New York courts had awarded custody to Mezitis on November 17, 1997.

Focusing on the issue of the children's habitual residence in October 2000, Judge Stanton stated:

That the children have been exclusively living in Greece with their mother for the past five years, during which time they have been attending school, establishing friendships, receiving medical treatment, and enjoying active involvement with Ms. Diorinou's extended family is conclusive evidence that, from their

perspective, they are "settled" in Greece.

*Diorinou,* 2000 WL 1793177, at \*3 (quoting *Feder v. Evans–Feder,* 63 F.3d 217, 218 (3d Cir.1995)). Judge Stanton recognized, however, that "Greece may not be [the children's] habitual residence if their original removal to Greece was wrongful, because a parent cannot create a new 'habitual residence' by the wrongful removal and sequestering of a child." *Id.* at \*4 (citing *Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 379 (8th Cir.1995)).[10] The District Judge then noted that the Greek courts considering Mezitis's Hague petition had ruled that Diorinou's retention of the children in Greece in 1995 was not wrongful, *see id.,* and he felt bound to accord full faith and credit to those adjudications by virtue of section 4(g) of ICARA, 42 U.S.C. § 11603(g). *See Diorinou,* 2000 WL 1793177, at \*4 \*5. In addition, he noted that he "would in any event, as a matter of comity and res judicata, adopt the determination that the children were not wrongfully retained in Greece." *Id.* at \*5. Thus, the degree of deference due the adjudications of the Greek Hague petition became critical.

*ICARA court deference.* Though ultimately not decisive for the outcome, we are in disagreement with Judge Stanton that section 4 of ICARA requires a federal or state court in the United States to accord full faith and credit to a Hague petition adjudication of another country. Section 4 of ICARA provides:

> Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.

42 U.S.C. § 11603(g). Section 3(8) of ICARA defines "State" to mean "any of the several States, the District of Columbia, and any commonwealth, territory, or possession of the United States." *Id.* § 11602(8). Although it might be possible to read "States" in section 4 to mean "Contracting States" (if the definition of section 3 were understood to define only the singular "State" and not the plural "States"), the legislative history clearly indicates that the word "States" in section 4 refers to the states of the United States. *See* H.R.Rep. No. 100–525, at 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 386, 393–94 ("Section 4(g) provides that full faith and credit shall be accorded throughout the United States to judgments and orders *of courts in the United States* rendered with regard to return actions pursuant to the Convention and the Act.") (emphasis added). Moreover, as a general matter, "judgments rendered in a foreign nation are not entitled to the protection of full faith and credit." Restatement (Second) of Conflict of Laws § 98 cmt. b (1971).

█ Nevertheless, American courts will normally accord considerable deference to foreign adjudications as a matter of comity. *See, e.g., Hilton,* 159 U.S. at 163, 16 S.Ct. 139 (enforceability of foreign country judgments a matter of the "comity of nations"); *Victrix Steamship Co., S.A.,* 825 F.2d at 713 (same); Restatement (Third) of Foreign Relations § 481 (1987) (recognition and enforcement of foreign judgments); Restatement (Second) of Conflict of Laws § 98 (1971) (recognition of foreign judgments). In particular, we have observed that comity "is at the heart of the [Hague] Convention." *Blondin,* 189 F.3d at 248; *cf. Friedrich v. Friedrich,* 78 F.3d 1060, 1068–69 (6th Cir.1996) (narrowly construing defenses under article 13 of the Convention because courts of country

---

**10.** In view of our disposition of this case, we need not decide whether the effect of an initial wrongful removal or retention could be dissipated by an unchallenged residence in the country of retention for an extended period of time. *See* Hague Convention, Art. 12 (wrongful removal challenged after one year must be remedied "unless it is demonstrated that the child is now settled in its new environment").

where abduction occurred may be relied on to protect child).

■ Mezitis contends that, because section 4 of ICARA limits full faith and credit deference to judgments of courts within the United States, it carries a negative implication that no deference is to be accorded foreign adjudications. We disagree. Even if the limited scope of section 4 implies a legislative preference not to extend formal full faith and credit recognition to foreign judgments, we see nothing in ICARA or its legislative history to indicate that Congress wanted to bar the courts of this country from giving foreign judgments the more flexible deference normally comprehended by the concept of international comity. Although deference as a matter of comity often entails consideration of the fairness of a foreign adjudicating system, *see Hilton*, 159 U.S. at 202, 16 S.Ct. 139 (inquiry whether foreign judgment obtained "under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries"); Restatement (Third) of Foreign Relations § 482, cmt. b (1987), a case-specific inquiry is sometimes appropriate, *see Hilton*, 159 U.S. at 202, 16 S.Ct. 139 (inquiry concerning "fraud in procuring the [foreign] judgment or *any other special reason* why the comity of this nation should not allow its full effect") (emphasis added); *Victrix Steamship*, 825 F.2d at 713 (comity prevails if foreign judgment "does not prejudice the rights of United States citizens or violate domestic public policy"); *Gordon and Breach Science Publishers*, 905 F.Supp. at 179 ("[I]t is primarily principles of fairness and reasonableness that should guide domestic courts in their preclusion determinations."); Restatement (Third) of Foreign Relations § 482 cmt. b (1987) ("[A] particular case may disclose such defects as to make the particular judgment not entitled to recognition."). Although we have no reason to question the fairness of the Greek system of jurisprudence, we think that, in this particular case, the complicated sequence of litigation and the force of the parties' contentions warrant our careful consideration of the determinations in Greece to which Diorinou asks us to defer.

*Greek Hague petition adjudications.* In the Greek Hague petition litigation, the Court of First Instance of Thessaloniki implicitly held that Diorinou had not wrongfully retained the children in Greece in September 1995. That holding was explicitly affirmed by the Courts of Appeals of Thessaloniki and by the Supreme Court of Greece. That holding is entitled to considerable deference, but, in order to determine how much deference, we deem it appropriate to give some consideration to the subsidiary determinations that underlie the holding.

The Court of First Instance of Thessaloniki found the following facts concerning the events in the summer of 1995 and particularly at the beginning of September 1995. Diorinou spent the summer with the children at her parents' house in Thessaloniki, while Mezitis stayed at his mother's house in Varzika. The couple had planned to return to New York on September 5. Two seats had been purchased, with the expectation that each parent would occupy a seat with one child (both children were then less than two). Diorinou learned from her travel agent that Mezitis had cancelled his September 5 ticket and the corresponding arrangement to travel with one child, and had bought a ticket for himself to return on September 4 without a child. Because the September 4 flight was fully booked, Diorinou could not obtain a ticket on her husband's flight for herself and the two children, and because she could not fly home with both children on her lap, she bought a ticket for herself to return to New York on September 2 without either child. The Court also found that prior to the summer of 1995, Mezitis had spent very little time with the children, even spending his free weekend time with his friends. The children were cared for by Diorinou. The Court also noted

that at the time the Greek Hague petition was filed, Diorinou had custody of the children pursuant to a judgment of the District Court of Athens.

Based on these findings, the Court concluded that it would not order the children's return. Although the opinion does not reach any explicit conclusion concerning the lawfulness of Diorinou's retention of the children in Greece, it plainly implies that her retention was not wrongful because Mezitis was not exercising "actual care" of the children (as required by Article 3). The Court also ruled under Article 13 that return "will expose [the children] to physical or psychological harm, or will otherwise place them in an intolerable situation."

The Court of Appeals of Thessaloniki accepted the facts as found by the Court of First Instance and found the following additional facts. Concerning where the parties stayed during the summer of 1995, the Court of Appeals found these additional facts: At the urging of Diorinou's mother, Mezitis came to Thessaloniki for three days and stayed at a hotel. During that visit the couple agreed to divorce and also agreed that Diorinou would keep the children with her in Thessaloniki as soon as the divorce proceeding was completed in the United States. The finding of an agreement concerning the children was based on an affidavit supplied by Diorinou's mother. Concerning Mezitis's change of travel plans and the parties' separate return to New York, the Court of Appeals found these additional facts: After the three-day visit to Thessaloniki, Mezitis had promised to stay in touch about the planned return to New York, but he made no contact. Diorinou's attempts to telephone him were unsuccessful. She

learned of his changed plans when she contacted her travel agent after she heard nothing from Mezitis.[11] After Mezitis's arrival in New York, some sort of altercation occurred between them, as a result of which Diorinou obtained a court order barring Mezitis from harassing her or excluding her from the marital home.[12] Diorinou proposed that they return to Greece and bring the children to New York for the duration of a New York divorce proceeding. Mezitis rejected that proposal.[13]

From these facts, the Court of Appeals concluded the following: (a) Diorinou "was forced to keep the children in Greece" by Mezitis's precipitous return to New York and his subsequent refusal to go with her back to Greece to bring the children to New York during the divorce proceedings, (b) Mezitis was not actually exercising his custody rights during the time the children remained in Greece, and (c) Mezitis agreed tacitly (by his conduct) and expressly that the children could remain in Greece with their mother. These conclusions led to a ruling that Diorinou had not wrongfully retained the children. In addition, the Court of Appeals ruled that an order for the children's return was precluded by Article 13(a) because Mezitis was not actually exercising custody rights during Diorinou's retention of the children and had acquiesced in their retention, and by Article 13(b) because

> if the children were forced to leave their mother, there would be grave danger of exposing them to psychological harm and place them in an intolerable situation.

The Supreme Court of Greece affirmed the Court of Appeals, endorsing all of the relevant findings and conclusions.

11. She apparently became apprehensive because she learned that Mezitis had cancelled her credit card.

12. The protective order was issued on September 9, 1995 by the New York Family Court. By its terms, it expired on September 29, 1995.

13. Mezitis contends that a condition of the proposal was that he agree that the children would thereafter permanently live in Greece with Diorinou.

■ *Degree of deference.* Although we start out with an inclination to accord deference to the Greek Hague petition adjudications as a matter of comity, we are given pause by some aspects of those rulings. In the first place, the courts' acceptance that Mezitis expressly agreed to let the children remain in Greece is troublesome. This finding rests solely on an affidavit of Diorinou's mother and is contradicted by his initiation of a custody proceeding in New York just one week after his return from Greece.[14] We are also dubious about the Greek courts' upholding of an Article 13(b) defense to the children's return. Article 13(b) is to be narrowly construed to preclude return only in extreme circumstances. *See Friedrich,* 78 F.3d at 1068–69. Our State Department has identified one parent's sexual abuse of a child as an example of the sort of misconduct that would warrant an Article 13 defense. *See* Public Notice 957, 71 Fed.Reg. 10494, 10510 (March 26, 1986). Moreover, the Department has cautioned that Article 13 "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." *Id.* The Greek courts' use of Article 13(b) appears to involve little more than an assessment of the children's best interests.

Despite these concerns, we see no reason not to defer to the Greek courts' fundamental ruling that Diorinou's retention of the children in Greece in September 1995 was not wrongful, even if not expressly agreed to by Mezitis. Those courts reasonably found that Mezitis ignored the children during what was to have been the 1995 family summer vacation in Greece and stayed with his mother. At the end of the summer, he cancelled his ticket to return with one child on the flight for which Diorinou was to return with the other child, and did not inform Diorinou of

his abrupt change of plans. She tried to return with the children on his flight, but could not get tickets. After she flew alone to New York, he refused her offer to return to Greece with her to bring the children to New York pending the divorce proceeding. Having found these circumstances, the Greek Hague petition courts made an entirely supportable determination that Diorinou had not wrongfully retained the children in Greece.

■ *Consideration of custody adjudications.* Our deference to the Greek Hague petition rulings that Diorinou did not wrongfully retain the children in Greece in 1995 does not necessarily end our consideration of whether Mezitis's removal of the children in 2000 requires an order for their return. The Convention contemplates that any wrongful removal (or retention) will be remedied by an order for return so that the issue of custody can be properly determined by a court of competent jurisdiction. *See* Elisa Pérez Vera, *Explanatory Report: Hague Conference on Private International Law, in* 3 Acts and Documents of the Fourteenth Session ¶ 19 (1980) ("*Pérez Vera Report* "), *available at* <http://www.hcch.net/e/conventions/menu28e.html>.[15] As the *Pérez Vera Report* states, "the Convention rests implicitly upon the principle that any debate on the merits of the question, *i.e.,* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal." *Id.* In the pending matter, a New York court has awarded custody to Mezitis, and a Greek court thereafter awarded custody to Diorinou.

Considering first the New York custody award, we note that Article 17 of the Convention provides:

> from Diorinou herself concerning the agreement.

**14.** It is possible that Mezitis made the agreement reported by Diorinou's mother and changed his mind upon returning to New York, but it is perplexing that the Greek Court relies only on the mother's affidavit and makes no mention of an affidavit or testimony

**15.** Ms. Pérez Vera was the official reporter for the Convention. *See Blondin,* 189 F.3d at 246 n. 5.

The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

In the pending ICARA action, Judge Stanton faithfully heeded Article 17, neither denying an order for return simply because of the New York custody award nor failing to "take account of" that award. He noted that the New York custody award had resulted from "a one-sided and defective presentation." *Diorinou*, 2000 WL 1793177, at *6. As he pointed out, Diorinou was not present, and Justice Heitler was advised by Mezitis's counsel that there had been no final decisions with regard to any of the Greek proceedings, although the Greek Hague petition had already been denied, and the denial affirmed.

As to the Greek custody award, it had no bearing on the Greek Hague petition decisions by the Court of First Instance and the Court of Appeals of Thessaloniki, because the custody award came after those decisions. To whatever extent that custody award might have relevance to the pending ICARA litigation, we see no reason to believe that the custody award was improperly made. The Court of First Instance of Athens acknowledged the pendency of the custody proceedings in New York, but ruled that such pendency did not preclude exercise of its jurisdiction.[16] The Court then carefully considered the best interests of the children. When the Greek custody award was appealed, the Court of Appeals of Athens did not impermissibly decline to honor the prior award of custody by the New York court to Mezitis. Although the Athens appellate court's ruling was technical, it relied on Mezitis's failure to present evidence that the prior New York custody judgment had become final.[17]

■ Although we are troubled by the existence of conflicting custody awards from the New York and Athens courts, we see no basis for declining to defer to the principal ruling in the Greek Hague petition litigation that Diorinou did not wrongfully retain the children in Greece in 1995. Thereafter, with custody validly awarded to Diorinou by the Athens courts, she was entitled to continue retention of the children in Thessaloniki and to seek an order requiring the children's return to Greece after Mezitis had violated her custody rights by wrongfully removing the children to New York.

## Conclusion

Ultimately, this dispute between parents is being resolved by deferring to the decisions of the Greek courts on the Greek Hague petition. Those decisions resolved controversies concerning a fact pattern that might not have been anticipated by the framers of the Hague Convention. Had Mezitis maintained his September 5, 1995, travel plans and returned to New York with Diorinou and the children, he might have won in a fully contested proceeding the custody award he ultimately obtained after a rather one-sided presentation. The children would then have been in his custody in New York. However, the Greek Hague petition courts found that by returning alone to New York and rejecting Diorinou's proposal that the children be

---

16. By the time the First Instance Court of Athens rendered its custody judgment on January 30, 1998, the New York Supreme Court had already entered its judgment awarding custody to Mezitis on November 17, 1997. The Athens custody court gives no indication that Mezitis was claiming that it should not merely stay its proceeding but should accord preclusive effect to what might have been shown to be a final foreign judgment. The Court stated, "[T]he objection raised by the defendant about pendency of the present case with other similar case pending before the American Courts is unfounded. . . ."

17. Presumably, all that would have been required was proof of the New York law on the time for appeal and a certificate from the New York appellate court indicating that no timely appeal had been filed.

brought to New York pending the divorce proceeding, he created the basis for the adverse rulings on the Greek Hague petition. In addition, the Athens appellate court found that by failing to prove the finality of the New York custody award in his favor, he provided the basis for that court to affirm the award of custody to Diorinou. Although the complex course of litigation involving these parties is not an entirely satisfactory basis on which to determine the lawfulness of Mezitis's self-help action in removing the children from Greece to New York, we conclude that Judge Stanton correctly ruled that the removal was wrongful and that an order for their return was warranted.

Accordingly, we affirm the Order of the District Court and remand for determination of costs pursuant to section 8(b) of ICARA, 42 U.S .C. § 11607(b). Diorinou may recover her appellate costs in this Court. Mezitis may file by 5 p.m., January 11, 2001, a petition for rehearing in letter form. *See* F.R.A.P. 40(a)(1). Unless such a timely filed petition is granted by noon, January 12, 2001, the stay previously entered barring return of the children to Greece will be vacated at that time, and the mandate will then issue. *See id.* 41(d)(1).