**Ernesto Enrique PAZ, Petitioner,**

v.

**Carmen Aida MEJIA DE PAZ, Respondent.**

**No. 01 CIV 6463 MGC.**

United States District Court,
S.D. New York.

Oct. 29, 2001.

Cahill Gordon & Reindel, New York, By David R. Owen, Esq., Thorn Rosenthal, Esq., for Petitioner.

Schreffler & Associates, New York, By Neil F. Schreffler, Esq., for Respondent.

*OPINION*

CEDARBAUM, District Judge.

Petitioner Ernesto Enrique Paz filed this petition pursuant to the Hague Convention on the Civil Aspects of Child Abduction (hereinafter "Convention"), as implemented by the International Child Abduction Remedies Act (hereinafter "ICARA"), 42 U.S.C. § 11601 et seq., seeking an order requiring his estranged wife, Carmen Aida Mejia de Paz, to return their daughter, Jordana Bettina Paz Mejia, to New Zealand. For the reasons that follow, Paz's petition is denied.

## BACKGROUND

Petitioner and respondent, both Peruvian natives and citizens, were married in Peru on March 10, 1987 and are still legally married. Shortly after their marriage, the couple moved to New Zealand, where Jordana was born on September 1, 1988.

In September 1990, petitioner and respondent separated. Respondent then obtained a joint custody order from the Otahuhu Family Court in Auckland, New Zealand. The order granted respondent primary custody of Jordana and permitted petitioner to visit Jordana for short periods of time on Wednesdays and Sundays. In addition, the court retained custody of Jordana's passport and prohibited Jordana from being removed from New Zealand. In October 1992, the Otahuhu Family Court amended its initial custody order, releasing Jordana's passport and authorizing respondent to remove Jordana from New Zealand and travel to Peru with her. The October 1992 court order is the last order by any New Zealand court in connection with the custody of Jordana.

In November 1992, respondent moved to Peru with Jordana with the understanding that petitioner would follow shortly, and the couple would attempt to reconcile. Petitioner moved to Peru in February 1993, and the couple lived together with Jordana from February 1993 until March 1998, although the marriage began to deteriorate

in late 1996. In March 1998, respondent moved to New Zealand with Jordana. In May 1998, petitioner followed respondent to New Zealand where they lived in the same house for one month. Respondent was unable to find employment in New Zealand, and returned alone to Peru in June 1998. In August 1998, petitioner moved to Peru with Jordana, but petitioner and respondent did not live together. Petitioner and respondent agreed to share custody of Jordana for alternating one-week periods.

In August 1998, respondent received an employment offer from a telecommunications company in New York. In December 1998, respondent and Jordana, accompanied by respondent's mother, moved to New York. Respondent began to work at the telecommunications company, but was unable to enroll Jordana in a New York elementary school in the middle of the school year. Jordana and her grandmother returned to Peru in February 1999, at the start of the new school semester in Peru. Jordana attended school in Peru until August 1999, when she returned with respondent to live in New York. Jordana then began attending a Catholic elementary school in New York. In December 1999, respondent sent Jordana to Peru to spend the Christmas holidays with her father. Jordana returned to New York in January 2000 and resumed her schooling.

In late February 2000, respondent sent Jordana to Peru with the understanding that Jordana would travel with petitioner to New Zealand for an extended stay with petitioner's sister. Respondent asserts that petitioner agreed to return Jordana to New York at the end of the New Zealand school term in July 2000. Jordana and petitioner traveled to New Zealand in late

March or early April 2000, where they stayed with petitioner's sister. In July 2000, respondent requested that petitioner return Jordana to New York in accordance with their agreement. Petitioner refused, and continued to keep Jordana in New Zealand until December 2000, despite repeated requests by respondent that petitioner return the child to New York.

In December 2000, Jordana returned to New York with respondent. Petitioner alleges that he agreed to allow the child to travel to New York only for the holiday period, and that he arrived in New York in January of 2001 with the intention of returning to New Zealand with Jordana. Respondent asserts that petitioner agreed to Jordana's permanent settlement in New York. Respondent also asserts that she gave petitioner $1,000, and helped him to obtain a visa so that he could come to the United States to study and be close to Jordana. In January 2001, petitioner flew from New Zealand to the United States. It is undisputed that when he arrived in the United States, respondent refused to allow him to take Jordana to New Zealand.

## DISCUSSION

■■■ The Convention seeks to "secure the prompt return of children wrongfully removed to or retained in any Contracting State." Convention, art. 1.[1] To that end, ICARA, the implementing legislation for the Convention, authorizes the filing of a petition for the return of a child in a United States district court. *See* 42 U.S.C. § 11603(b). Under the Convention, "a United States District Court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." *Friedrich v.*

---

1. The United States and New Zealand are both contracting parties to the Convention. *See* List of Hague Convention Signatory Countries (visited Oct. 22, 2001) <http://travel.state.gov/hague_list.html>.

*Friedrich,* 983 F.2d 1396, 1400 (6th Cir. 1993) (citing Convention, art. 19). This is because "a child's country of habitual residence is best placed to decide upon questions of custody and access." *Croll v. Croll,* 229 F.3d 133, 137 (2d Cir.2000).

When a federal court receives a petition alleging wrongful retention in violation of the Convention, the court must decide whether the petitioner has proven by a preponderance of the credible evidence that the child was "wrongfully removed or retained" within the meaning of the Convention. *See* 42 U.S.C. § 11603(e)(1)(A). If a court determines that a petitioner has met his burden, the Convention directs the court to "order the return of the child." Convention, art. 12.

Article 3 of the Convention states that a child has been wrongfully removed or retained when:

a) [the removal] is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3. From the text of article 3, it is clear that petitioner must therefore establish the following elements: 1) New Zealand was the child's habitual residence "immediately before the...retention"; [2] 2) petitioner had a right of custody over Jordana under the law of New Zealand; and 3) petitioner was exercising his right of custody over Jordana at the time of the allegedly wrongful retention. *See* Convention, art. 3. Petitioner must prove each of

these elements by a preponderance of the evidence, including the habitual residence of the child. *See* 42 U.S.C. § 11603(e)(1)(A); *see also Diorinou v. Mezitis,* 132 F.Supp.2d 139, 143 (S.D.N.Y. 2000); *Pesin v. Rodriguez,* 77 F.Supp.2d 1277, 1283 (S.D.Fla.1999).

The Convention does not define the term "habitual residence." This has allowed courts in the United States to interpret the term fluidly as the facts of the particular case require. *See Mozes v. Mozes,* 239 F.3d 1067, 1071 (9th Cir.2001) (quoting J.H.C. Morris, Dicey and Morris on the Conflict of Laws 144 (10th Ed.1980)); *Diorinou,* 132 F.Supp.2d at 143. What is a child's "habitual residence" is a mixed question of fact and law which is heavily dependent on the particular facts of each case.

In seeking to apply the Convention and ICARA, courts have pointed to certain factors as helpful in determining a child's habitual residence. Specifically, courts have given considerable weight to evidence that the child has become acclimated to her surroundings in the alleged country of habitual residence. *See, e.g., Feder v. Feder,* 63 F.3d 217, 224 (3d Cir.1995); *Diorinou,* 132 F.Supp.2d at 143. Courts have also considered the shared, present intention of the parents with respect to the child, in cases where the facts suggest such an intention. *See, e.g., Feder,* 63 F.3d at 224; *Mozes,* 239 F.3d at 1074–76.

■ Petitioner complains that respondent wrongfully retained Jordana by refusing to allow her to accompany him to New Zealand when he arrived in the United States in January 2001. Under the Hague Convention, "the relevant period of habitual residence is that span of time 'immediately before' the date of the alleged wrongful retention." *Pesin,* 77 F.Supp.2d at

**2.** For the purposes of this petition, it is not necessary to consider whether any other country, including the United States, was Jor-dana's habitual residence. *See Brooke v. Willis,* 907 F.Supp. 57, 61 n. 2 (S.D.N.Y.1995).

1284–85. The focus, therefore, is on the evidence concerning the period immediately prior to December of 2000.

## Acclimatization

The parties agree that Jordana spent approximately nine or ten months in New Zealand immediately prior to the time of the allegedly wrongful retention. Petitioner argues that during Jordana's stay in New Zealand, Jordana became so acclimated to her surroundings that she developed a settled purpose to reside in New Zealand. In support of this argument, petitioner notes that Jordana attended school during her ten-month stay in New Zealand, made many friends during that time, and developed a "personal attachment" to New Zealand.

This evidence must be viewed in the light of Jordana's frequent relocation. The longest period of residence in a single country after the parents' separation was in Peru, from 1993 to 1998, but neither party suggests that Peru is Jordana's habitual residence. An examination of the undisputed facts reveals that after the parties left Peru in 1998, Jordana's country of residence was changed at least nine times. Before her stay in New Zealand for ten months in 2000, Jordana did not reside in any one country for an uninterrupted period longer than approximately six months. Petitioner must therefore demonstrate that Jordana did more than merely adjust to her surroundings, something Jordana has had to do frequently in the last three years.

██ Petitioner's showing does not establish acclimatization in New Zealand. Jordana attended school in Peru and the United States for extensive periods before her ten-month stay in New Zealand. Immediately prior to her stay in New Zealand, Jordana had attended school in New York for more than a semester. Respondent has submitted evidence that Jordana made friends in New York and has extended family in the United States. Petitioner has established only that Jordana "settled" in New Zealand to the same extent that she "settled" in any previous location. In other words, petitioner has shown that Jordana merely "spent a very full year in" New Zealand. *See Mozes*, 239 F.3d at 1083 (internal quotes omitted). Jordana's own words suggest as much: "I like both places. I like to stay here [in the United States] because I like it here as well." (Tr. of Hr'g of August 14, 2001, at 12.)

## The Shared Intentions of the Parents

The parties dispute each other's intentions with respect to almost every relocation in the past three years. Respondent asserts that she agreed that Jordana would stay in New Zealand only until July of 2000, when respondent would bring Jordana back to New York. Petitioner asserts that he and respondent made no such agreement, and further insists that Jordana came to live in New Zealand indefinitely.

I have had the opportunity to hear the testimony of petitioner, respondent, and Jordana. After listening to and observing the demeanor of each witness, I find that respondent was a forthcoming and credible witness. I accept respondent's testimony that the parties agreed that Jordana would live with petitioner in New Zealand during the year 2000 on a temporary basis only.

██ The undisputed facts show that between 1990 and 2000, respondent established a pattern of control over where Jordana lived. This pattern was established as early as 1990, when respondent received an order from the Otahuhu family court granting her primary custody of Jordana, and allowing petitioner to visit only during short periods on Wednesdays and Sundays. Respondent later requested, and received, an amendment to this order allowing her to leave the country with Jor-

dana. Since the end of her parents' last attempt at reconciliation in March 1998, Jordana has moved nine times, most of the time with respondent. In March 1998, after living for some six years in Peru, respondent moved to New Zealand with Jordana. In August 1998, after respondent moved back to Peru, petitioner and Jordana joined her in Peru at respondent's request. In December 1998, respondent moved to the United States, again with Jordana. In February 1999, respondent sent Jordana to Peru. In August 1999, petitioner sent Jordana back to New York at respondent's request. Respondent then allowed Jordana to visit New Zealand specifically for the Christmas holidays, from December 1999 to January 2000.

The undisputed evidence also shows that Jordana was accustomed to residing with her mother. As noted above, the Otahuhu Family Court gave respondent primary custody of Jordana in 1990. In 1992, the court amended its order to give respondent permission to take Jordana out of the country, effectively giving her sole custody of Jordana. The undisputed evidence shows that between the date of the amendment in 1992 and Jordana's trip to New Zealand in March 2000, Jordana lived apart from her mother for a total of nine months. The longest separation lasted from February to August 1999, when respondent sent Jordana to Peru temporarily because of respondent's inability to find schooling for Jordana in the United States. In light of these facts, petitioner's allegation that respondent sent Jordana to New Zealand in March 2000 with the intention of allowing her to live there indefinitely, while respondent lived and worked in the United States, is not credible.

Accordingly, petitioner has failed to prove by a preponderance of the credible evidence that New Zealand was Jordana's habitual residence immediately prior to respondent's allegedly wrongful retention of Jordana in the United States. Because New Zealand was not Jordana's habitual residence, it is unnecessary to address the question of custodial rights under the laws of New Zealand.

## CONCLUSION

For the foregoing reasons, Ernesto Enrique Paz's Petition For Return of Child to New Zealand Under the Hague Convention is denied.

SO ORDERED.